[Cite as *Furbee v. Bittner*, 2015-Ohio-4425.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## LAKE COUNTY, OHIO

| | | |
|---|---|---|
| WILLIAM FURBEE, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NOS. 2014-L-077,**<br>**2014-L-080,**<br>**2014-L-091,** |
| PATRICIA M. BITTNER, et al., | : | **2014-L-106,**<br>**and 2014-L-107** |
| Defendant-Appellant. | : | |

Appeals from the Lake County Court of Common Pleas, Juvenile Division, Case No. 2004 PR 02450.

Judgment: Affirmed.

*Paul R. Malchesky,* Cannon, Aveni & Malchesky Co., L.P.A., 41 East Erie Street, Painesville, OH 44077 (For Plaintiff-Appellee).

*David J. Sternberg,* Sternberg & Zeid Co., L.P.A., 7547 Mentor Avenue, #301, Mentor, OH 44060-5466 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Patricia Bittner, appeals from the judgments of the Lake County Court of Common Pleas, Juvenile Division, inter alia, adopting the magistrate's decision awarding custody of the minor child, R.B., to appellee, William Furbee. The Guardian Ad Litem, Rebecca J. Castell, ("GAL") has also filed a brief contesting the trial court's adoption of the magistrate's decision. For the reasons discussed in this opinion, we affirm the judgment of the trial court.

{¶2} R.B., daughter of appellant and appellee, was born in December 2003; the parties were never married, but remained in a relationship until shortly after their daughter was born. In December 2004, appellee filed a motion for visitation. By way of agreed judgment entry, appellee was granted visitation every other weekend from Friday, 7:00 p.m. through Monday, 11:00 a.m., along with five weeks summer parenting time. Appellee was required to provide for all transportation vis-à-vis visitation, which involved a multiple-hour drive each way.

{¶3} From 2004 through November 2012, appellee exercised his parenting time on a regular basis and provided the transportation as required by the order. During this time, appellant resided with her parents and had several mental health episodes that required hospitalization. In the fall of 2012, appellant's mother fell ill and passed away.

{¶4} Appellant, who has a schizoaffective disorder, experienced significant psychiatric problems subsequent to her mother's death. She thought her father, Jack Bittner, was satan, and believed her brother-in-law, Steve O'Shea, was his evil helper. On one occasion, appellant became agitated with her father and attacked him over one of her mother's rings. This took place in front of R.B., who called 911. Appellant was placed in a mental hospital for seven days after this incident.

{¶5} During the weeks following her mother's death, appellant also indicated she feared the family cat because, in her view, it came from a cursed pyramid. She expressed a concern that she was going to be mummified and the cat was sent to be her guardian into the underworld.

{¶6} Throughout October and November 2012, appellant had been considering moving to the state of Washington with R.B. Appellant's father encouraged the move so

2

she could get away from the area after her mother's passing. Accordingly, on or about November 30, 2012, without discussing the change of residence with appellee or the court, appellant moved with R.B. to Washington to live with her sister, Teresa O'Shea and her husband, Steve.

{¶7} Appellee subsequently attempted to contact R.B. for six consecutive days, but was unable to reach her. Ultimately, he called the police to check on the child. The police visited Jack Bittner's residence, where R.B. had been living, but did not find the child.

{¶8} Finally, on December 7, 2012, appellant contacted appellee and advised him she and R.B. were staying with her sister in Washington. On December 11, 2012, appellee filed an emergency ex parte motion for temporary custody as a result of appellant's removal of R.B. from Ohio. Appellee subsequently filed a motion for legal custody on January 31, 2013. Appellee later filed a motion to show cause, alleging he had been denied parenting time with his daughter due to appellant's actions.

{¶9} Appellant recognized she had no plan for appellee to visit R.B., despite the agreed visitation order. Eventually, R.B. was enrolled in school in Washington. In March 2013, however, appellant was asked to leave the O'Shea home due to mental illness. She returned to Ohio, but left R.B. in the custody of the O'Sheas. According to appellee, he did not learn of appellant's return until the fall of 2013.

{¶10} Appellee communicated with R.B. between one and three times a week via telephone; he believed his calls were being monitored or disrupted by appellant or her family and maintained R.B. was being turned against him. And when appellee

attempted to arrange a visit in July 2013, Steve O'Shea stated they could discuss visitation when appellant "signed over guardianship" of R.B. to the O'Sheas.

{¶11} Although appellant conceded that removing R.B. from Ohio alienated the child from appellee, R.B. ostensibly thrived while living in Washington. While attending third grade, she was taken off an IEP. R.B. also became actively involved in ice skating.

{¶12} Due to the mental health issues and concerns that R.B. was being overly influenced by Jack Bittner as well as the O'Sheas, the GAL recommended psychological evaluations be performed on all parties as well as R.B. In October 2013, the parties agreed to undergo psychological examinations; join the O'Sheas to the pending action; and return R.B. to Ohio at the end of her fall semester in order to live with appellant and visit with appellee.

{¶13} Dr. Farshid Afsarifard was retained to perform the psychological examinations. His initial observations raised concerns regarding R.B.'s emotional stability. He expressed concerns about the problems engendered by the parties' inability to effectively work together. He recommended R.B. remain in Washington with the O'Sheas until the end of her fourth grade year. This would permit the child to remain stable and keep the structure within which she had been living for the previous year.

{¶14} R.B. returned to Ohio from Washington on December 23, 2013, and was reunited with appellee the next day in Dr. Afsarifard's office. R.B. left the office with appellee who spent Christmas Eve with appellee and his family. Appellee stated R.B. adjusted back into his family almost immediately and was fine during the visit. R.B.

4

visited appellant on Christmas and then spent the following week with appellee. The GAL requested the court permit R.B. to return to Washington to finish the school year; the request was denied and R.B. was returned to appellant, who re-enrolled the child in Kirtland Elementary. Since returning to Ohio, R.B. continued to visit with appellee while residing with appellant.

{¶15} On October 23, 2013, the GAL filed her report. In the report, the GAL determined a change of circumstances had occurred since the prior decree and thus, she recommended R.B. be placed in the legal custody of appellee. Trial on appellee's motion for legal custody commenced January 13, 2014 and continued January 14, 2014; May 12, 2014; and May 13, 2014. On May 9, 2014, prior to the hearing's completion, the GAL filed a revised report in which she changed her recommendation; in the revised report, the GAL determined there had been no change of circumstances sufficient to warrant a modification of the custody order. The GAL therefore recommended that R.B. remain in appellant's custody.

{¶16} On June 27, 2014, the magistrate issued his decision. In the decision, the magistrate, inter alia, recommended granting appellee legal custody of R.B. Preliminary objections to the magistrate's decision were filed by appellant, the GAL, and third-party defendants, the O'Sheas.

{¶17} On August 6, 2014, the trial court sua sponte issued an interim order transferring R.B. to appellee's school district. Appellant, the GAL, and the O'Sheas filed notices of appeal to this order. Appellee subsequently filed an emergency ex parte motion for possessory time on August 15, 2014. The court granted this motion on August 18, 2014. The GAL appealed this judgment.

{¶18} After the transcript of proceedings was filed, the GAL filed motions to stay the trial court's interim orders pending appeal. The trial court denied these motions. After reviewing the objections, the trial court adopted the magistrate's decision on October 16, 2014. Notices of appeal were filed by appellant and the GAL. The various appeals were subsequently consolidated. Appellant assigns three errors for our review. Her first assignment of error provides:

{¶19} "The magistrate erred in terminating child support as of February 2013."

{¶20} Under this assignment of error, appellant contends the magistrate erred in terminating the child support order in February 2013 because the conclusion was not supported by any facts or testimony. We do not agree.

{¶21} In his decision, the magistrate noted that when appellee was laid off from 2008 through 2010, his support obligation was reduced to $50 per month. In March 2012, the Lake County Child Support Enforcement Agency ("LCCSEA") calculated appellee's support obligation in the amount of $368.50 per month. LCCSEA subsequently issued an administrative order for appellee to commence paying that amount. The magistrate observed that appellee filed a motion for a hearing on the child support issue on January 3, 2014; in that motion, appellant noted that appellee requested a hearing on the child support issue on April 12, 2012, but no action had been taken.

{¶22} In his decision, the magistrate stated that appellant's former attorneys did not aggressively pursue the support issue; instead, the magistrate asserted, parenting time was "always at the forefront." The magistrate further commented, "[a] good portion

6

of the delay in hearing is directly attributable to [appellant's] flight from the jurisdiction and the way she and her former attorneys decided to pursue the support issue."

{¶23} With the foregoing background in mind, the magistrate determined appellee should pay child support to appellant in the amount of $368.50 from March 2012, the date of the administrative order, through February 2013, the time at which appellant left R.B. in the care and custody of the O'Sheas. The magistrate justified his decision for limiting child support in this respect and we discern nothing unreasonable in his rationale. The trial court, therefore, did not abuse its discretion in adopting this portion of the magistrate's order.

{¶24} Appellant's first assignment of error lacks merit.

{¶25} We shall treat both appellant's second assignment of error and the GAL's first and second assignments of error together as they are analytically related. For her second assignment of error, appellant contends:

{¶26} "The magistrate abused his discretion in granting Furbee's motion for legal custody was against the manifest weight of the evidence." (Sic.)

{¶27} The GAL's first and second assignments of error provide:

{¶28} "[1.] The trial court erred by awarding legal custody of the minor child to father against the manifest weight of the evidence.

{¶29} "[2.] The trial court abused its discretion by failing to consider the best interest of the minor child in awarding a change of custody to father."

{¶30} Before addressing the weight-of-the-evidence challenges and the GAL's argument asserting error relating to the court's best-interest determination, we shall first address several preliminary arguments raised by appellant. Appellant first asserts the

7

magistrate erred in basing his decision on an in-camera interview with R.B. Appellant contends the magistrate is required to consider the entire transcript of proceedings, rather than rely exclusively on his interview with the child. This argument lacks merit.

{¶31} First of all, the magistrate's decision clearly demonstrates he considered all the evidence and testimony submitted at the hearing. The magistrate does speak to the information he gleaned from R.B. during the in-camera interview. This information, however, was directly relevant to the statutory best-interest analysis pursuant to R.C. 3109.04(F)(1)(b), which mandates a court to consider "the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court [if the court has conducted an interview.]"

{¶32} In his decision, the magistrate notes that R.B. expressed her wish to remain with the O'Sheas; because, however, both parents were interested in maintaining custody of the child, their right to care and custody of R.B. take priority. R.B. also expressed an interest in remaining with appellant; as will be discussed fully below, however, the court determined, in light of the surrounding circumstances of the case, that remaining with appellant was simply not in R.B.'s best interest. The magistrate's decision demonstrates he considered the in-camera interview as well as the evidence presented at the hearing. We discern no error in the manner in which the magistrate proceeded in entering his decision.

{¶33} Appellant further argues the magistrate was not an unbiased fact finder to the extent his examination of the GAL exhibited "disdain" for her viewpoints. We do not agree.

**{¶34}** Although the magistrate vigorously questioned the GAL, the inquiries do not indicate a bias. Rather, the GAL, in her initial report recommended, in light of the surrounding circumstances of appellant's mental illness, hospitalizations, and her unilateral decision to remove R.B. from Ohio, which effectively deprived appellee of visitation, that appellee be granted custody. In her revised report, she changed her recommendation, concluding appellant should retain custody because, during the several months she had custody of R.B. prior to the hearing, she had demonstrated greater stability managing her mental health. The magistrate, however, questioned the GAL's recommendation *in light* of appellant's past behavior and actions. This line of questioning did not exhibit disdain, but, rather, an interest in rendering a decision that would adequately protect R.B.'s best interest as well as the relative parental rights at stake in the case. We therefore see no bias in the manner in which the magistrate examined the GAL.

**{¶35}** Next, appellant argues the magistrate erred in concluding she cannot or is not willing to provide adequate care for the minor child. Although the magistrate did draw the foregoing conclusion, he did so in relation to the O'Sheas' motion for custody. The magistrate specifically ruled that the O'Sheas met their burden regarding appellant's inability or unwillingness to provide adequate care for R.B., but they failed to do so as it related to appellee. As a result, the magistrate determined, their motion for legal custody was denied. The O'Sheas did not appeal this judgment. In this respect, appellant's argument is misdirected.

**{¶36}** It further bears noting that appellee was not required to establish appellant cannot or is not willing to provide adequate care for R.B. As will be discussed below, for

9

a change of custody, R.C. 3109.04(E) requires a change of circumstances and a determination that (1) the modification is in the child's best interests and (2) the harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child. To the extent the magistrate's finding relating to the O'Sheas' motion had no legal bearing upon the magistrate's ultimate conclusion to grant custody to appellee, any analysis of those issues would be advisory dicta. It is well-settled that appellate courts do not indulge in advisory opinions. *Cascioli v. Cent. Mut. Ins. Co.*, 4 Ohio St.3d 179, 183 (1983). We shall therefore refrain from addressing this argument.

**{¶37}** Next, appellant asserts the magistrate erred in concluding appellee's other four children are "marginal" to the custody case. In her brief, however, appellant identifies an exchange, during the hearing, between the magistrate and Dr. Afsarifard, relating to appellee's wife, not their children. During this exchange, the magistrate observed that the mental health of appellee's wife is a marginal issue as compared to the mental health of the parties. Whether the magistrate's statement is completely accurate is debatable; nevertheless, the angle of the exchange at issue was to focus the doctor's attention on whether he could say appellant could remain functionally and psychologically stable, especially in light of her history of mental instability. The doctor stated he could not make such a prediction, but observed, if past events are the only basis of an assessment, he would also look to some of the questionable decisions appellee's wife had made in her past. The magistrate noted that any issues relating to appellee's wife's past were of marginal import for purposes of his inquiry into appellant's

10

psychological stability. We find nothing peculiar or problematic regarding the manner in which the magistrate managed the dialogue with the doctor.

{¶38} We additionally note that R.B.'s relationship and interaction with appellee's other four children is not marginal, and we do not read the magistrate's decision to suggest otherwise. The magistrate acknowledges that the two eldest twin daughters were sexually abused by their previous stepfather and were in counseling; he further underscored that appellee's son has special needs and the youngest daughter was, at the time of the hearing, not quite two years old. Appellee testified that all the children get along well and the magistrate underscored that appellee and his wife are both responsible in their employment and support their household. Given these points, we cannot conclude the magistrate disregarded appellee's other children as marginally relevant to the custody allocation.

{¶39} We shall now turn to appellant's and the GAL's arguments asserting the magistrate's decision, relating to a change of circumstance and R.B.'s best interests, is against the manifest weight of the evidence.

{¶40} R.C. 3109.04(E)(1) governs change-of-custody actions. It provides:

{¶41} (E)(1)(a) The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:

{¶42} * * *

11

**{¶43}** (iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

**{¶44}** "[B]efore a modification can be made pursuant to R.C. 3109.04(E)(1)(a), the trial court must make a threshold determination that a change in circumstances has occurred." *Buttolph v. Buttolph*, 9th Dist. Wayne No. 09CA0003, 2009-Ohio-6909, ¶11. Moreover, the requisite change of circumstances "must be a change of substance, not a slight or inconsequential change." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). The statute is intentionally designed to require a significant change in order "to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the child a 'better' environment." *Id.*, quoting *Wyss v. Wyss*, 3 Ohio App.3d 412, 416 (10th Dist.1982).

**{¶45}** In his decision, the magistrate made a preliminary finding that there had been a change of circumstances since the prior decree. To wit, the magistrate identified the following facts upon which it premised its conclusion: Appellant denied contact between R.B. and appellee for over a year; she removed R.B. from the state; she ratified the placement of R.B. in a new school system in the state of Washington; she abandoned R.B. in Washington and ceded custody to the O'Sheas; the O'Sheas retained custody of R.B., despite appellee's demands to return the child; the magistrate further underscored appellant's numerous mental health problems that had surfaced since her mother's passing as well as the multiple hospitalizations to which she has been subject; and, finally, the magistrate identified the trauma the child has experienced as a result of appellant's mental instability.

**{¶46}** The foregoing findings represent facts and actions that occurred since the original order; the significance of appellant's mental health issues were not apparent at the time of the prior order. Moreover, nothing in the record indicates appellant, or her family, took active steps to prevent appellee from exercising visitation at the time the agreed order was entered. Conversely, there was adequate direct and circumstantial evidence to support the inference that appellant, with the assistance and encouragement of her family, took measures to preclude appellee from visiting R.B. during and after the unilateral move to Washington. The magistrate's findings are supported by the record and it is not our position to re-weigh the evidence or substitute our judgment for that of the trial court. *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). We therefore conclude the magistrate did not err in finding a change of circumstances sufficient to meet the statutory requirements.

**{¶47}** Moreover, the magistrate engaged in a thorough analysis of each statutory best-interest factor set forth under R.C. 3109.04(F)(1)(a) – (j). Those factors are as follows:

> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶48} In considering the foregoing factors, the magistrate acknowledged that R.B. expressed a desire to remain with the O'Sheas and, secondarily, expressed an interest in remaining with appellant. The magistrate also recognized that, while R.B.

14

had a strong bond with appellant, R.B. exhibited a lack of respect for appellant as well. And, the magistrate noted, the bond R.B. has with appellant must be viewed in light of her total removal from appellee's companionship and influence. The magistrate underscored that R.B.'s relationship and interaction with appellee had been completely severed for over a year by appellant's move to Washington and the O'Sheas' steadfast position on remaining R.B.'s de facto custodian well after appellant had left Washington.

{¶49} The magistrate expressed concern over appellant's erratic mental health and emphasized that, even though she has been stable for several months, she was not in counseling; and the magistrate was dubious, in light of appellant's history of severe mental health issues, that she would be capable of maintaining her stability, especially if she is forced to deal with a traumatic or life-changing event. Alternatively, the magistrate found appellee, who conceded he suffered from depression some years ago, has no mental or physical health issues.

{¶50} The magistrate noted appellee has maintained a job and provided for a household without outside intervention. Alternatively, the magistrate pointed out that appellant, prior to her recent stability, was unable to independently maintain a household on her own or her mental health without multiple hospitalizations, much less independently provide for the needs of R.B. He further emphasized appellant's history of poor compliance with taking medications and seeking treatment. And, in light of appellant's history of depending upon her father and the O'Sheas, if appellant retained custody of R.B., the child would be further exposed to individuals who, in the magistrate's opinion, aided in significantly alienating the child from appellee, an environment that would not serve R.B.'s best interests.

15

{¶51} The magistrate acknowledged that both the GAL and Dr. Afsarifard "lobbied" for the child to remain with either the O'Sheas or appellant to the extent each believed awarding appellee custody would cause adjustment issues in a new school, home, and community. Nevertheless, the magistrate pointed out, after R.B. left Washington and enrolled in Kirtland Elementary and resumed visitation with appellee, she experienced no adjustment problems.

{¶52} The magistrate found that appellant, her father, and the O'Sheas "systematically and egregiously flouted the Court's Order of parenting time for [appellee]. The child was intentionally removed from the state, the consequences to [appellee] were as if the child had been placed in the permanent custody of the state." Moreover, the court determined appellant had a history of willfully denying appellee the right to parenting time. The record reflects that, not only did she remove R.B. from Ohio without consulting appellee or the court, she, on other occasions would decline appellee visitation. To wit, appellee testified that in 2010, over a six-month period, he did not receive visitation during two 30-day increments; additionally, in May 2012, he was denied two weekend visits. The magistrate therefore found appellee would be significantly more likely to honor and facilitate court-approved parenting time.

{¶53} The magistrate found, given the case history, the only way to guarantee appellee would have an appropriate parent-child relationship with R.B. would be to remove her from the people who severed that relationship. The magistrate consequently determined that the surrounding circumstances demonstrated it was in R.B.'s best interests to be placed in appellee's custody. We hold the magistrate's conclusion was a sound exercise of his discretion. Further, in light of the evidence, as

16

well as the magistrate's factual findings, the foregoing determination supports the conclusion that any harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child. Accordingly, the magistrate's decision is supported by the weight of the evidence and the trial court did not abuse its discretion in adopting the same.

**{¶54}** Appellant's second assignment of error is without merit; the GAL's two assignments of error are similarly without merit.

**{¶55}** Appellant's final assignment of error provides:

**{¶56}** "The court erred in ordering emergency relief pursuant to Juvenile Rule 40(D)(4)(e)(ii) regarding venue of school enrollment for the minor child."

**{¶57}** On August 6, 2014, the trial court entered an interim order transferring R.B. to appellee's school district. Appellant asserts the trial court erred in ordering this transfer because there was no motion for such relief and there was no emergency justifying such relief. Because we affirm the trial court's adoption of the magistrate's decision relating to the change of custody, R.B. will necessarily be attending a school in appellee's district. Any argument relating to the order at issue is therefore moot.

**{¶58}** Appellant's third assignment of error is without merit.

**{¶59}** For the reasons discussed in this opinion, the judgment of the Lake County Court of Common Pleas, Juvenile Division, is affirmed.


DIANE V. GRENDELL, J.,

THOMAS R. WRIGHT, J.,

concur.

17